IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**RANDALL DUNCAN**                                                                 **PLAINTIFFS**
**and RMDI LLC**

**v.**                          **CASE NO. 4:16-CV-00910 BSM**

**JAMES HARMON**                                                  **DEFENDANT**

## ORDER

Defendant James Harmon's motion to dismiss [Doc. No. 6] based on the failure to state a claim pursuant to Rule 12(b)(6), the lack of personal jurisdiction pursuant to Rule 12(b)(2), and the doctrine of *forum non conveniens* is denied. No evidentiary hearing is needed, and the request is denied. *See* Doc. No. 16, at 9. The stay is hereby lifted, and an amended initial scheduling order shall issue.

## I. BACKGROUND

Plaintiff Randall Duncan is a resident of Arkansas and owner of plaintiff RMDI, a limited liability company organized under Arkansas law. Plaintiffs bring suit against defendant, who maintains residency in both Indiana and in the Carribean Island of Sint Maarten. Br. Supp. Mot. Dismiss, Doc. No. 10, at 1; Doc. No. 13-1, at 48 (email in which defendant refers to his "Indiana home office"). Plaintiffs claims are primarily based on a fraudulent statement made by defendant in Arkansas on January 28, 2014, which plaintiffs say induced Duncan to purchase defendant's half ownership interest in Carribean Cash Services, N.V. ("CCS"), a Sint Maarten limited liability company, and Cash Advance Systems, Ltd. ("CAS"), an Anguillan corporation.

CCS is a microlending company that makes small, short-term, unsecured loans to residents of Sint Maarten and Curacao. Defendant founded CCS and owned a half interest in both CCS and CAS until he sold his shares in both companies to Duncan, who assigned them to RMDI. Duncan and defendant met through Rufus Wolff, an Arkansas lawyer with whom they were mutually acquainted. Although the parties dispute who initiated the negotiations, it seems clear that Wolff played a large role in facilitating the deal between Duncan and Harmon. In fact, the record indicates that defendant communicated with plaintiff almost entirely through Wolff. *See* Doc. No. 13-23 (email from defendant stating, "Any reason why I can't have an email for Randy and Greg at this time if appropriate?").

Defendant says Wolff first suggested Duncan as a proposed purchaser via email on August 29, 2013, and at that time, Wolff represented that he had already met with Duncan three times regarding the tentative deal. Harmon Decl. ¶ 17., Doc. No. 7. Using Wolff as an intermediary, Duncan and defendant then negotiated the deal almost entirely by email or other forms of long-distance communication. By September 13, 2013, Wolff advised via email that Duncan was 99% sure he wanted to invest, and Wolff and Duncan traveled to Sint Maarten in October 2013 to negotiate terms and conduct due diligence regarding the tentative investment. *Id.* ¶¶ 17, 18. This trip was the first time defendant and Duncan met in person. *Id.* ¶ 18.

Due to the potential tax consequences defendant would suffer if he did not close the deal by the end of the year, defendant aggressively pursued closing the deal as the end of the year approached. Duncan still had reservations, however, so the parties agreed to execute

the CCS Stock Purchase Agreement and the CAS Stock Purchase Agreement electronically on December 31, 2013, each from their respective locations, *see id.* ¶ 20, with a side agreement that would allow plaintiff more time to rescind the agreement if he chose.

Before Duncan would finalize the deal, he arranged for defendant to make an "informal" visit to Arkansas in January 2014:

> "Jim, You do not need to bring anything besides yourself and Citrana. You will not be meeting any of my other partners. The meeting will just be the two of us and Rufus and will be very informal. Likewise, there is nothing for you to prepare to talk about as it is logistics, timing and practical matters we will be discussing. Anything else that might come up you can shoot from the hip. This is not going to be a tense or pressure packed meeting. I am sure we could have dealt with any of my concerns over the phone. However, since we are planning on being partners in this venture for a long time I think it is very important for us to have the same expectations from the beginning and it is helpful to me to talk face to face instead of over the phone or by email since some things get lost in the translation. I just need to make sure there is nothing I have forgotten to deal with and am doubly sure this is the right thing for my investors, since I will be going from very liquid assets to a concentrated position in a very illiquid asset. I also know it was inconvenient for you and Citrana to change your plans and come on this trip at the last minute. Thank you again for doing so and I look forward to seeing you both soon. Randy."

Doc. No. 7-11. The subject line of the email reads, "Emailing: Side Agreement Jan 31 14."

Apparently, defendant and his wife were in Indiana tending to personal matters when the trip to Arkansas was planned. Duncan picked up defendant and his wife from the airport on January 28, 2014, and they had dinner at Duncan's home. According to Duncan, "in response to [his] direct question of whether Harmon was aware of any potential pending changes in the regulation of the Business, Harmon stated that he was not aware of any such pending or considered changes." Complaint ¶ 19, Doc. No. 2. Plaintiffs assert the statement

3

was fraudulent because defendant was actually aware that Central Bank in Sint Maarten had proposed a regulation in which the maximum annual percentage rate ("APR") would be capped at 24% and because defendant intended that Duncan would rely on the false statement in entering the stock purchase agreements. *Id.* ¶¶ 25–27, 45. The visit ended the next morning when Duncan took Harmon and his wife back to the airport.

On February 12, 2014, Duncan paid defendant $1,531,403 by wire transfer pursuant to the CCS Stock Purchase Agreement and $600,000 by wire transfer pursuant to the CAS Stock Purchase Agreement. *Id.* ¶¶ 21–22. On December 20, 2016, plaintiffs filed a complaint against defendant for fraud and for violations of registration and anti-fraud provisions of the Arkansas Securities Act ("ASA").

Notably, the agreement between the parties contemplated a continuing business relationship between defendant in Sint Maarten and plaintiffs in Arkansas. *See* Doc. No. 13-4; Doc. No. 16, at 16. The parties to this action have also engaged in litigation in Sint Maarten related to CCS's purported termination of defendant's employment, which occurred on or about November 23, 2016. Harmon Decl. ¶¶ 6, 31. That litigation relates to defendant's employment under Section 7.5 of the CCS Purchase Agreement. Doc. No. 10, at 23.

## II. DISCUSSION

### A. <u>Failure to State a Claim</u>

Defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is denied. This rule permits dismissal when the plaintiff fails to state a claim upon which

4

relief may be granted. To meet the 12(b)(6) standard, a complaint must allege sufficient facts to entitle the plaintiff to the relief sought. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). Although detailed factual allegations are not required, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, are insufficient. *Id.* In ruling on a 12(b)(6) motion to dismiss, materials embraced by the pleadings, as well as exhibits attached to the pleadings and matters of public record, may all be considered. *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010).

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard for claims grounded in fraud to enable a defendant to "respond specifically and quickly to the potentially damaging allegations." *OmegaGenesis Corp. v. Mayo Found. for Med. Educ. & Research*, 851 F.3d 800, 804 (8th Cir. 2017); *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The rule requires that the complaint allege "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002).

Plaintiffs have adequately stated a fraud claim. They claim, "[o]n or about January 28, 2014, at Duncan's home in White County, Arkansas, in response to Duncan's direct question of whether Harmon was aware of any potential pending changes in the regulation

5

of the Business, Harmon stated that he was not aware of any such pending or considered changes." Compl. ¶ 19. Plaintiffs further claim that defendant was actually aware of the pending changes due to a letter defendant received from Central Bank in Sint Maarten. *Id.* ¶¶ 25–27, 36. Plaintiffs claim the false statement was material to the agreement and that defendant intended Duncan would rely on it. *Id.* ¶¶ 26, 34, 37, 39, 42–45. Finally, plaintiffs claim that Duncan justifiably relied on the false statement, and plaintiffs sustained damage as a result. *Id.* ¶¶ 39, 48, 50, 51. The complaint addresses the time, place, and contents of the false statement as well as the identity of the person making it, and it asserts that Duncan gave up the ability to enter the deal with his eyes open. *Id.* ¶ 39 ("It caused Plaintiffs to, among other things, misapprehend the risks and overvalue the CCS Stock and the CAS Stock."). The requirements of Rule 9(b) are satisfied.

Defendant also attacks the complaint because he asserts that fraud cannot be premised on the failure to accurately predict future events. This argument is unpersuasive because Duncan is claiming that defendant misrepresented his own knowledge on January 28, 2014, when the statement at issue was made.

Defendant further argues that count II fails to state a claim because the Arkansas Securities Act exempts isolated nonissuer transactions. Doc. No. 10, at 27. The complaint states that the CCS and CAS stock constitute securities that were not exempted by the ASA. Compl. ¶¶ 54, 56, 57. Moreover, while demonstrating that a security is exempt may constitute a defense, plaintiffs were not required to preemptively address this defense in the complaint. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (explaining that burden of pleading

6

a defense rests with defendant, and there is "no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating [it] in his complaint"); *Hunter v. State*, 952 S.W.2d 145, 147 (Ark. 1997) (once the State has met the burden of showing that a sale of, or an offer to sell, an unregistered security took place, "the burden shifts to the seller to show that the security was either exempt from registration or was registered"); *Schultz v. Rector-Phillips-Morse, Inc.*, 552 S.W.2d 4, 12 (Ark. 1977) ("Upon the showing of a sale of a security, the burden of proof shifts to the seller to show that the security was either registered, or was not required to be registered under the terms of the Arkansas Securities Act.").

Finally, defendant asserts that count III of the complaint fails to state a claim under the ASA's anti-fraud provision because the complaint does not state facts showing applicability of the ASA. Doc. No. 10, at 26–27. Defendant argues that the complaint fails to allege that defendant made an offer to sell in this state, directed any offer into this state by mail or otherwise, or accepted an offer to buy in this state. Doc. No. 10, at 27. The parties formed a contract, however, so either defendant offered to sell the stock or Duncan offered to buy it. *See Taxi Connection v. Dakota, Minnesota & E. R.R. Corp.*, 513 F.3d 823, 826 (8th Cir. 2008) (an offer is a necessary component of contract formation). The ASA provides that "an offer to sell or to buy is made in [Arkansas], whether or not either party is then present in [Arkansas], when the offer originates from [Arkansas] or [i]s directed by the offeror to [Arkansas] and received at the place to which it is directed." Ark. Code Ann. § 23-42-103(a)(3). It also provides, "Acceptance is communicated to the offeror in this state,

7

whether or not either party is then present in this state, when the offeree directs it to the offeror in this state reasonably believing the offeror to be in this state and it is received at the place to which it is directed or at any post office in this state in the case of a mailed acceptance." *Id.* § 23-42-103(a)(4)(B). Thus, defendant's reliance on his lack of physical presence in Arkansas until January 2014 is not dispositive. The complaint provides fair notice of what the claim is and the grounds upon which it rests and will not be dismissed for failure to state a claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

B. Personal Jurisdiction

The motion to dismiss for lack of personal jurisdiction is denied. To survive a motion to dismiss challenging personal jurisdiction, the complaint must state sufficient facts to support a reasonable inference that a defendant may be subjected to jurisdiction in the forum state. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). A plaintiff's prima facie showing "must be tested, not by the pleadings alone, but by affidavits and exhibits supporting or opposing the motion." *Id.* The party seeking to establish personal jurisdiction carries the burden of proof on the issue. *Id.* When no hearing is held on the motion, the facts are viewed in a light most favorable to the nonmoving party. *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011).

"In a diversity suit, a federal court may exercise jurisdiction over a nonresident defendant only if the requirements of the forum state's long-arm statute are met and the exercise of jurisdiction comports with due process." *Pangaea, Inc.*, 647 F.3d 741, 745 (8th Cir. 2011). Arkansas's long-arm statute provides for jurisdiction over persons and claims

to the maximum extent permitted by constitutional due process. Ark. Code Ann. § 16-4-101. Here, plaintiff asserts that defendant is subject to specific, not general, personal jurisdiction in Arkansas.

Specific jurisdiction may be established when a defendant purposefully avails himself of the privilege of conducting activities within a state and the claim arises out of the defendant's contacts with or activities within the forum. *Fastpath, Inc.*, 760 F.3d at 820; *Pangaea, Inc.*, 647 F.3d at 745–46. Generally, no single factor is determinative, and personal jurisdiction is evaluated by a totality of the circumstances. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010) ("We must look at all of the factors in the aggregate and examine the totality of the circumstances in making a personal-jurisdiction determination."). The five factors used in determining the sufficiency of a non-resident defendant's contacts with the forum state include 1) the quantity of contacts with the forum state; 2) the quality of contacts with the forum state; 3) the relation of the cause of action to the contacts; 4) the interest of the forum state in providing a forum for its residents; and 5) the convenience of the parties. *Fastpath, Inc.*, 760 F.3d at 821.

First, the quantity of contacts with Arkansas was extensive. The parties negotiated through numerous phone calls and emails occurring from August 2013 through January 2014, when negotiations culminated with defendant's visit to Duncan's home in Arkansas. Harmon Aff. ¶¶ 17–22; Wolff Aff. ¶¶ 16–27, Doc. No. 13-1. According to plaintiffs, defendant directed over 300 emails to Wolff or Duncan in Arkansas to facilitate the deal. Wolff Aff., ¶ 26.

9

Second, the quality of contacts with Arkansas was purposeful, not fortuitous. Defendant knew Wolff, who brokered the deal, was an Arkansas lawyer, and defendant knew the potential buyer Wolff found was an Arkansas resident who owned an Arkansas business. Doc. No. 13-11. It is unclear who initiated the negotiations, but this consideration is relatively unimportant given the aggressive nature with which defendant pursued the business relationship and negotiations. *See, e.g.*, Doc. No. 13-15 (Harmon says, "I know you are off today for Independence day, but want an update. . . . I need to move this along."); Doc. No. 13-16 (Harmon says, "It has been two seeks since any communication. Seemed from your correspondence below it was on a faster track. . . . Please let me hear from you."); Doc. No. 13-20 (Harmon says, "Of course I want to keep this moving and I know it is the Eve Eve of Christmas, but please let's try to get this done."); Doc. No. 13-21 (Harmon says, "I do want to do whatever we can to make this an iron clad December 31 closing for IRS purposes. It means a great deal to me tax wise to do so."); Doc. No. 13-22 (Harmon says, "Let's try to get on this and get it done in time for email signatures or Fed Ex signatures."); Doc. No. 13-23 (subject line reads, "Sure is quiet in Little Rock!", and Harmon says, "Upon funding I would like Randy's submission information for Centrale Bank Aruba as soon as possible."); Doc. No. 13-24 (Harmon says, "I am getting some heartburn on the delay of payment by wire under our agreements. . . . Please expedite the wires and advise me on their placement so I may insure clearing on the island and confirm clearing in Indiana."). "Without having to stipulate who initiated the contact . . . what is clear is that [defendant] pursued a business relationship with [plaintiffs]," and this demonstrates purposeful availment. *Wessels, Arnold*

*& Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1432–33 (8th Cir. 1995).

Third, this cause of action is also highly related to defendant's contacts with Arkansas. The fraudulent act comprising the basis of this lawsuit occurred in Duncan's home in Arkansas, with the corresponding injury to be suffered in Arkansas. When fraudulent conduct is intended to induce commercial activity within a forum, and the defendant knows the injury will be felt in that forum, he must reasonably anticipate being haled into court in that forum to answer for the truth of the statements. *Calder v. Jones*, 465 U.S. 783, 790 (1984); *Finley v. River North Recordings, Inc.*, 148 F.3d 913, 916 (8th Cir. 1998). In *Finley*, an out-of-state defendant directed promotional materials and fraudulent statements via telephone and mail at a business in Arkansas. 148 F.3d at 914–15. In finding that the court had personal jurisdiction over the defendant, it focused on the fraudulent statements directed at and intended to induce commercial activity and tortious injury within Arkansas. *Id.* at 916. Similar to *Finley*, plaintiffs here allege defendant directed promotional activity and fraudulent statements at Arkansas. A lack of physical presence in the forum does not change the outcome. *Burger King Corp. v. Rudzewicz,*, 471 U.S. 462, 476 (1985) ("Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State."); *Pangaea, Inc.*, 647 F.3d at 748 ("even though the defendant's sole physical contact with the Arkansas forum was its attempted delivery of the goods in Marion, Arkansas, defendant's total activities directed at the forum were 'purposeful'").

Though the last two factors are of lesser importance, *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1390 (8th Cir. 1991), they also weigh in favor if ruling that

Arkansas has personal jurisdiction. Arkansas's interest in providing a forum for citizens injured by fraudulent statements is a salient interest. *See KV Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 595 (8th Cir. 2011) (noting that forum state "obviously has an interest in providing a forum for" residents). The convenience of the parties, however, does not weigh heavily in either direction. *See id.* Plaintiffs will have to travel to Sint Maarten, or defendant will have to travel to Arkansas. Witnesses are likely located in both Arkansas and Sint Maarten, and both scenarios will present inconveniences. *See id.*

In sum, the factors weighing in favor of personal jurisdiction include (1) numerous and purposeful emails and phone calls directed from defendant to plaintiff in Arkansas, *Pangaea, Inc.*, 647 F.3d at 747–48; (2) a contractual relationship that contemplated a continuing relationship and obligation with an Arkansas resident, *Burger King Corp.*, 471 U.S. at 473 ("With respect to interstate contractual obligations, . . . parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities."); *Dudley v. Dittmer*, 795 F.2d 669, 672 (8th Cir. 1986); (3) a visit to Arkansas directed at finalizing the negotiations, *see Papachristou v. Turbines, Inc.*, 902 F.2d 685, 686 (8th Cir. 1990) ("The side trip to Marion, which can hardly be called accidental, was for the purpose of carrying out the contract."); (4) a fraudulent statement intended to induce commercial activity within Arkansas, *Finley*, 148 F.3d at 916; (5) litigation arising out of that statement, *see Pangaea, Inc.*, 647 F.3d at 749; (6) injury occurring within the forum, *Finley*, 148 F.3d at 916 ("An individual injured in California need not go to Florida to seek redress

from persons who, though remaining in Florida, knowingly cause the injury in California.") (*quoting Calder*, 465 U.S. at 790); and (7) defendant allegedly profiting from his fraudulent statements, *Dudley*, 795 F.2d at 672 (considering that defendant derived substantial profits from his communications with plaintiff); *Publ'n Servs. of Am., Inc. v. Cro*, No. CIV. 06 1515DWF/RLE, 2006 WL 2583216, at *3 (D. Minn. Sept. 1, 2006) ("Rather, the court found that the defendant had purposefully availed himself toward Arkansas because he benefitted from his contacts with Arkansas . . . .").

Finally, the choice-of-law provisions are insufficient to overcome the other factors weighing in favor of exercising personal jurisdiction over defendant. *Fastpath, Inc.*, 760 F.3d at 821–22; *Wessels, Arnold & Henderson*, 65 F.3d at 1434. The CCS agreement and the CAS agreement provide that they "shall be construed in accordance with and governed for all purposes by the laws of" Sint Maarten and Anguilla respectively. CCS Stock Purchase Agreement ¶ 13.13, Doc. No. 2, at 40; CAS Stock Purchase Agreement ¶ 13.13, Doc. No. 2, at 62. If this was an action for breach of contract requiring an interpretation of the contract, the choice-of-law provision would be entitled to more weight, but it is not. This is an action for fraud and for violations of the Arkansas Securities Act, and the substantive law to be applied is that of Arkansas.

### C. *Forum Non Conveniens*

The motion to dismiss for *forum non conveniens* is denied. The doctrine of *forum non conveniens* allows a court to decline to exercise jurisdiction and dismiss a case when that case would more appropriately be brought in a foreign jurisdiction. 28 U.S.C. § 1404 ("For

13

the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."); *KV Pharm. Co.*, 648 F.3d at 597. A foreign forum may be more appropriate when trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience or when the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007).

The first step in a *forum non conveniens* analysis is to determine whether the alternative forum is adequate. *de Melo v. Lederle Labs., Div. of Am. Cyanamid Corp.*, 801 F.2d 1058, 1061 (8th Cir. 1986). Generally, a forum is adequate if the defendant is amenable to process there. *Cruz v. Cooper Tire & Rubber Co.*, No. 09-CV-4033, 2009 WL 4016606, at *2 (W.D. Ark. Nov 19, 2009). The parties are already started litigating in the alternative forum, Sint Maarten, and defendant consents to litigation there, so defendant is amenable to process in Sint Maarten. Further, plaintiffs do not specifically oppose Sint Maarten as an inadequate forum. Therefore, it is adequate.

The next step requires the balancing of private interests affecting the convenience of the litigants with public interests affecting the convenience of the forum. *de Melo*, 801 F.2d at 1062. Private interest factors include the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; the possibility and need for viewing of the

premises, if applicable to the action; the potential enforceability of a judgment; and all other practical problems that make trial easy, expeditious, and inexpensive. *KV Pharm. Co.*, 648 F.3d at 597; *CSI Tech., Inc. v. Commtest Instruments Ltd.*, No. CIV. 08 450 RHK/JJK, 2008 WL 4057546, at *5 (D. Minn. Aug. 26, 2008). Public interest factors include court congestion; whether the burden of jury duty is imposed on a community having no relation to the litigation; whether the people of a foreign community are interested in having the litigation resolved locally; and the appropriateness in having the trial of a diversity case in a forum familiar with the applicable state law. *Id.* (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504 (1947)). The defendant bears the heavy burden of persuasion as to each factor, and the doctrine should be applied to disrupt a plaintiff's choice of forum only under "exceptional circumstances" in which the factors strongly favor the defendant. *Id.* at 597–98; *Reid Walen v. Hansen*, 933 F.2d 1390, 1396 (8th Cir. 1991) ("the plaintiff's forum choice *always* should be accorded substantial deference at the outset"); *CSI Tech., Inc.*, 2008 WL 4057546 at *4 ("heavy" burden rests with the movant to demonstrate transfer is warranted).

Defendant asserts that Duncan has a residence in Sint Maarten, operates a business there, and is already engaged in litigation there regarding "certain portions of the Stock Purchase Agreement." Doc. No. 10, at 24. Plaintiffs point out that defendant has a residence in Indiana and is present there for medical treatment frequently. Harmon Decl. ¶ 5, at 1–2. Again, either forum will present inconveniences. The fact that Duncan has already been inconvenienced by litigation in Sint Maarten does not mean being forced to litigate this case in Sint Maarten is convenient for him, as demonstrated by his staunch opposition to

defendant's motion to dismiss. Accordingly, the convenience of the parties does not weigh strongly in either direction. If anything, the convenience of the parties weighs in favor of plaintiffs because plaintiffs and defendant are all citizens of the United States. *See Reid-Walen*, 933 F.2d at 1395–96 (explaining that by giving "little weight to . . . the fact that both plaintiff and the defendants were American citizens," the district court departed from the proper analysis).

Defendant asserts that "[m]ost of the witnesses are located in Sint Maarten and Curacao," and "[n]one of these people will be subject to service of process issued by an American [c]ourt." Doc. No. 10, at 23. Defendant does not develop this argument. Notably, he does not address whether plaintiffs' witnesses would be subject to compulsory process in Sint Maarten, *see Reid-Walen*, 933 F.2d at 1397 (noting that suit in U.S. means parties will lack compulsory process over Jamaican witnesses and suit in Jamaica likewise means parties will lack compulsory process over American witnesses). Additionally, he does not address whether witnesses such as Andrew Berry and Vanita Nathumal would be unwilling to testify, which is curious considering they appear to be employed by plaintiffs. *See Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 342–43 (8th Cir. 1983) ("In making this evaluation, the district court did not address the fact that many of the witnesses work for the Holiday Inn and compulsory process probably would not be necessary to produce its own employees for an appearance at trial."). Furthermore, some witnesses are undeniably located in Arkansas, such as plaintiffs and Rufus Wolff. And, the time and expense of obtaining the testimony of a foreign witness are significantly lessened by common place modes of modern

technology because "[a]ny foreign witness testimony may be taken, if possible, by deposition or other means." *Reid-Walen*, 933 F.2d at 1397 (citing *Lehman*, 713 F.2d at 342–43).

Defendant similarly asserts that "[m]ost of the documents relevant to this case are located in Sint Maarten or Curacao," and that "[a] sizeable number of them are in Dutch." Doc. No. 10, at 23. As with foreign witnesses, modern technology mitigates his concerns greatly, so this factor is not entitled to great weight. *CSI Tech., Inc.*, 2008 WL 4057546 at *7. Defendant provides no details as to the sorts of Dutch documents he considers relevant, but he cites an order issued by a Sint Maarten court on January 20, 2017, as an example. Doc. No. 10, at 24. It is unclear why defendant believes that order is relevant, and the fact that judges in Sint Maarten are bilingual is of questionable value when the lawsuit arises under Arkansas law, when the defendant has failed to explain what Dutch documents are critical, and when the parties herein speak English. Although the burden of translating documents into foreign languages may "not [be] easily ignored," defendant has failed to explain what documents, if any, require translation. Additionally, even if the courts in Sint Maarten produce their orders and opinions in Dutch, as defendant suggests, "it is apparent that the translation problem will be oppressive regardless of the forum" and despite the presence of bilingual judges. *See de Melo*, 801 F.2d at 1063.

As for the enforceability of a potential judgment, plaintiffs point out that a judgment from a United States court could be enforced in Indiana, where defendant resides and owns property and where defendant received the larger purchase price per the CCS Stock Purchase Agreement. *See* Harmon Decl. ¶ 20. Public interest factors also fail to present compelling

reasons to decline to hear this case because the alleged injury occurred in Arkansas, not Sint Maarten, and because the law to be applied is Arkansas law.

### III.  CONCLUSION

For all these reasons, defendant James Harmon's motion to dismiss [Doc. No. 6] is denied, the stay is hereby lifted, and an amended initial scheduling order shall issue.

IT IS SO ORDERED this 2nd day of November 2017.

_____
UNITED STATES DISTRICT JUDGE